UNITED STATES OF AMERICA
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABUKAR ABAS
ABDIKADIR HASAN

Case No. 21-_____

       plaintiff

v                                      Hon.:

GP LOGISTICS, LLC.
And GOBRANDS, INC.
d/b/a goPuff

       defendants

Attorney for plaintiff:
Nicholas Roumel (P37056)
NACHT & ROUMEL, P.C.
101 N. Main St., Ste. 555
Ann Arbor MI  48104
734-663-7550
*nroumel@nachtlaw.com*

**COMPLAINT AND JURY DEMAND**

Plaintiffs makes their complaint as follows:

**Parties/Jurisdiction/Venue**

1.    Plaintiffs are Abukar Abas ("Abukar") and Abdikadir Hasan ("Abdikadir").

1

2. Plaintiffs are non-white, of Somali heritage, and practicing Muslims.

3. Plaintiffs are residents of Ann Arbor, Washtenaw County, Michigan, in the Eastern District of Michigan.

4. Defendant GB Logistics, LLC ("GB"). GB is a Delaware corporation, headquartered in Philadelphia, Pennsylvania. They are registered as a "foreign limited liability company" with the state of Michigan. Their resident agent is CSC-Lawyers Incorporating Service, 2900 West Road, Ste. 500, East Lansing MI 48823.

5. GB's corporate headquarters are at the same address as Defendant "GoBrands, Inc.," ("GoBrands"), also a Delaware corporation company headquartered in Philadelphia, Pennsylvania. The two companies have common ownership. GoBrands, operates under the assumed name of "goPuff" in myriad locations throughout the United States, including the state of Michigan.

6. GoBrands is also registered with the State of Michigan as a "foreign profit corporation" and their Michigan resident agent is the same as GB's.

7.  The facts giving rise to this lawsuit took place in the goPuff facility located at 1902 Federal Boulevard, Ann Arbor, Michigan, Washtenaw County.

8.  goPuff operates facilities that collect snack foods, beverages, and other convenience items in a warehouse, and are delivered by drivers, such as the Plaintiffs, to consumers who order the products through its website or mobile application.

9.  Drivers are classified as independent contractors, who contract with Defendant GB. The parties' contracts are attached hereto as Exhibit A.

10. As alleged more fully below, drivers are misclassified. They are more properly employees of both Defendants, who operate as joint employers of the drivers.

11. Plaintiffs filed EEOC charges alleging discrimination on the basis of race, color, religion, national origin, and retaliation for opposing discrimination.

12. On or about September 14, 2020, Plaintiffs received right to sue letters from the EEOC dated September 9, 2020.

13. Although Plaintiffs purportedly affixed electronic signatures to arbitration agreements with GB, they bring this lawsuit in good faith reliance on section 1 of the Federal Arbitration Act (9 U.S.C. §1), which exempts

"contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Plaintiffs assert that they are engaged in transporting goods on the "last mile" of interstate commerce and accordingly, that their employment contracts – along with the arbitration clauses therein – are not enforceable pursuant to this theory.

### Plaintiffs' Employment

14. Abdikadir was hired as a driver approximately May 1, 2019. His employment was terminated approximately August 27, 2019.

15. Abukar was hired as a driver approximately May 20, 2019. He remains employed by Defendants.

### Discrimination - Abdikadir

16. Plaintiffs assert that they were treated differently on the basis of their race, national origin, and religion.

17. For example, Abdikadir's supervisor Monica, on information and belief a white, non-Muslim female, criticized Abdikadir, who is Muslim, for praying at work (she texted "the product is just sitting here because he's praying again").

18. Abdikadir was terminated on or about August 31, 2019. On information and belief, Monica told another employee, Eyal, that Abdikadir refused to take orders from a female operations manager (Ashley) because of

4

his religion.

19. Monica also stated this to Abukar. However, when Abukar asked Ashley if what Monica was saying was true, Ashley denied it.

20. Thus, even though both parties to this alleged encounter - Ashley and Abdikadir – each denied that Abdikadir refused to take orders from Ashley, Abdikadir was nonetheless terminated for this alleged transgression.

## Discrimination - Abukar

21. On or about August 24, 2019, Scott Sanford visited Ann Arbor's goPuff facility. Sanford was represented to be a Regional Manager, and/or a Director of Loss Prevention, for goPuff.

22. Sanford investigated Abukar, along with his brother Abdurahman Abas and his cousin Mohamed Isse, who both worked for goPuff, of improperly wasting inventory and taking expired products for their own use.

23. Abukar, Abdurahman, and Mohamed responded that they were only doing as trained and provided written statements in conformity.

24. Abdurahman and Mohamed (goPuff employees) were nonetheless terminated.

25. While Abukar is still employed as a driver (ostensibly for GB),

5

he was nonetheless investigated and accused by a goPuff corporate manager/director.

26. In contrast, on information and belief, Monica was neither pulled into an office, investigated or accused, even though she discarded product the same as Plaintiffs. Instead, she was seen laughing and joking with Sanford and was not terminated.

27. In summary:

a. Plaintiff Abdikadir was criticized for praying at work, and fired over the false accusation that he refused to take orders from Ashley because of his religion;

b. Plaintiff Abukar, a driver for GB, was investigated and falsely accused over the same thing (though he is still working there as a driver);

c. Abdul and Mohamed (goPuff employees who are not parties in this case) were fired over the false expired product accusations.

28. The above actions were motivated by discrimination on the basis of race/national origin/religion.

**Legal Allegations**

*Count I – Injunctive and Declaratory Relief – "Independent Contracts"*

29. Plaintiffs **Abukar** and **Abdikar** signed "Technology Services Agreements" with Defendant GB Logistics, LLC. ("Exhibit A")

30. These Agreements required them to use "goPuff Services" and to download a separate mobile application called "goDrive" in order for them to interface with goPuff and their customers.

31. GoBrands and GB Logistics are joint employers of these drivers. They have common ownership and are located at the same headquarters. GoBrands and GB Logistics operate a joint venture that operates under the assumed name "goPuff."

32. Moreover, goPuff's website (goPuff.com) invites applications for driving or warehouse positions – i.e., one would apply through goPuff to become either an employee or an "independent contractor."

33. goPuff management had power to control and determine these drivers' essential terms and conditions of employment. Indeed, goPuff's Director of Loss Prevention, Scott Sanford, had the power to investigate and terminate these drivers, and did in fact investigate Abukar and provide information for Abdikadir's termination.

34. It is germane to goPuff's business model that the drivers are part of the same management and operations as the warehouse workers. After all, the warehouse workers give the food products to the drivers for delivery. Without employing both types of positions, goPuff could not operate as it does.

35. "Entities are joint employers if they 'share or co-determine those matters governing essential terms and conditions of employment.' To determine whether an entity is the plaintiff's joint employer, we look to an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *E.E.O.C. v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013) (quoting *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985))."

36. The Sixth Circuit uses a six-factor test to determine whether a worker is an employee or independent contractor: 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon her skill; 5) the degree of the alleged employer's right to control the manner in which the work is performed; and 6) whether the service rendered is an integral part of the alleged employer's business. *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015).

37. The drivers meet that test here. They have an open-ended relationship with goPuff. The drivers deliver the food products using their own cars, so while the workers have investment in the materials used to do the job, it is unskilled labor. The drivers do not have opportunity for profit or

loss as they may not freely assign routes to subcontractors. And although the drivers select when they want to work, the employer still retains the right to control the manner in which the drivers perform their work.

38. Finally, the drivers are integral to goPuff as they exclusively provide the means of delivering food products to the customer. As a food delivery service, goPuff could not operate without its drivers.

39. In summary, the factors primarily weigh in favor of these drivers being joint employees of both Defendants, and being misclassified as independent contractors.

40. As such, these plaintiff drivers are entitled to rescission of the "Technology Services Agreement" with Defendants, even to the extent it may be enforceable under the FAA and declaratory judgment declaring the parties' relationship to be one of employee and joint employer.

*Count II – Breach of Implied Contract/Unjust Enrichment – Failure to Pay Plaintiffs as Employees*

41. In every employment relationship in Michigan there is an implied contract, for services to be performed in exchange for just compensation.

42. The driver Plaintiffs performed services to the benefit of Defendants as an employee, as set forth above.

9

43. Defendants breached the implied contract of employment between the parties by systematically avoiding the payment of the following sums, which were instead borne by the Plaintiffs, *inter alia:*

    a. the purchase or lease, maintenance, operating costs and adornment of vehicles; insurance; and other accoutrements; and

    b. lost profits, self-employment taxes, premiums for insurance to replace workers compensation, unemployment compensation, and disability benefits, business expenses that should have been paid by the employer, and other damages.

44. Plaintiffs are entitled to compensation for the above expenses they were illegally required by Defendants to bear, as well as the *quantum meruit* value of their services as employees.

*Count III – Title VII – Race/Color/National Origin Discrimination in Employment*

45. Defendants were, at all relevant times, employers as defined by Title VII of the Civil Rights Act of 1964.

46. Plaintiffs were employees as defined by Title VII.

47. As non-white Somali natives, Plaintiffs are protected persons under Title VII on the basis of race, color, and/or national origin.

48. Defendants' animus towards Plaintiffs, their severe and pervasive retaliatory harassment and other interference with their

employment, and their adverse actions, were illegally motivated by Plaintiffs' race, color, and/or national origin.

49. Defendants' discrimination has damaged Plaintiffs as stated herein and below.

*Count IV – ELCRA – Race/Color/National Origin Discrimination in Employment*

50. Defendants were, at all relevant times, employers as defined by the Elliott-Larson Civil Rights Act ["ELCRA"], Michigan Compiled Laws ["MCL"] 37.2201 *et seq.*

51. Plaintiffs were employees as defined by ELCRA.

52. As non-white Somali natives, Plaintiffs are protected persons under ELCRA on the basis of race, color and/or national origin.

53. Defendants' animus towards Plaintiffs, their severe and pervasive retaliatory harassment and other interference with their employment, and their adverse actions, were illegally motivated by Plaintiffs' race, color, and/or national origin.

54. Defendants' discrimination has damaged Plaintiffs as stated herein and below.

*Count V – Title VII – Religious Discrimination in Employment*

55. Plaintiffs are Muslim, and this was known to Defendants.

56. Defendants discriminated against Plaintiffs on the basis of their religion, by expressing hostility to them and their beliefs, and subjecting them to adverse employment actions as described above, in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e-2; 29 CFR 1605.1 *et seq.*

57. Defendants' animus towards Plaintiffs, their severe and pervasive retaliatory harassment and other interference with their employment, and their adverse actions, were illegally motivated by Plaintiffs' religion.

58. Defendants' discrimination has damaged Plaintiffs as stated herein and below.

*Count VI – ELCRA – Religious Discrimination in Employment*

59. Plaintiffs are Muslim, and this was known to Defendants.

60. Defendants discriminated against Plaintiffs on the basis of their religion, by expressing hostility to them and their beliefs, and subjecting them to adverse employment actions as described above, in violation of the Elliott-Larsen Civil Right Act ("ELCRA"), MCL 37.2202.

61. Defendants' animus towards Plaintiffs, their severe and pervasive retaliatory harassment and other interference with their employment, and their adverse actions, were illegally motivated by Plaintiffs' religion.

62. Defendants' discrimination has damaged Plaintiffs as stated herein and below.

*Count VII – Retaliation – Title VII*

63. Plaintiffs' made statements to Defendants, including Monica and Scott Sanford, stating that they believed that they were being singled out and investigated on the basis of their race/religion/national origin.

64. These statements, opposed to discrimination, constituted protected activity under Title VII.

65. Plaintiffs' protected activity was made in good faith.

66. Defendants' animus towards Plaintiffs, their severe and pervasive retaliatory harassment and other interference with their employment, and their adverse actions, were illegally motivated by Plaintiffs' protected activity.

67. This retaliation was in violation of Title VII, 42 U.S.C. §2000e-3(a).

68. Defendants' retaliation has damaged Plaintiffs as stated herein and below.

*Count VIII – Retaliation – ELCRA*

69. Plaintiffs' opposition to discrimination, as described above, constituted protected activity under ELCRA.

70. Plaintiffs' protected activity was made in good faith.

71. Defendants' animus towards Plaintiffs, their severe and pervasive retaliatory harassment and other interference with their employment, and their adverse actions, were illegally motivated by Plaintiffs' protected activity.

72. This retaliation was in violation of ELCRA, MCL § 37.2701 (a).

73. Defendants' retaliation has damaged Plaintiffs as stated herein and below.

*Count IX – Violation of 42 U.S.C. 1981*

74. 42 U.S.C. § 1981 provides:

*Equal Rights Under the Law*

All persons in the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefit of all of laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

75. Under the 14th Amendment, Plaintiffs have the guaranteed right to make and enforce contracts.

76. 42 U.S.C. § 1981 prohibits intentional discrimination in the making and enforcement of contract involving both, public and private actors.

77. Plaintiffs were subjected to intentional discrimination by Defendants, through their agents, representatives, and employees, because of their race, color, and/or national origin.

78. Defendants, through their agents, representatives and employees, discriminated against Plaintiffs in violation of 42 U.S.C. § 1981 and deprived Plaintiff of their civil rights to make and enforce contracts by among other things:

   a. Subjecting Plaintiffs, because of their ethnic and national origin background, to discrimination in the making and enforcement of their employment contracts;

   b. Subjecting Plaintiffs, because of their ethnic and national origin background, to embarrassment, humiliation, verbal and nonverbal harassment on its premises, which had the purpose and/or effect of denying Plaintiff full and/or equal access to the enjoyment and use of all benefits, privileges, terms, and conditions of the contractual relationship between Plaintiffs and Defendants in the employment setting; and

   c. Subjecting Plaintiffs to severe and emotional distress and anguish by their discrimination and retaliatory harassment.

79. Because of Defendants' unlawful actions, Plaintiffs have sustained damages as set forth below.

*Count X – Declaratory and Injunctive Relief - FAA*

80. Plaintiffs Abukar and Abdikadir are drivers engaged in the "last mile" or "last leg" of interstate commerce.

81. As such, to the extent the arbitration clauses contained in their purported "Technology Services Agreement" may otherwise be valid, the arbitration clauses are not enforceable per the Federal Arbitration Act (9 U.S.C. §1), which exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

*Count XI – Intentional Interference with Business Relations and Expectancy*

82. As an alternative count, should Plaintiffs Abukar and Abdikadir not be found to be employees of Defendants, they bring this count of intentional interference with their business relations and expectancies.

83. These Plaintiffs had a valid business relationship and or expectancy to continue enjoyment of their "Technology Services Agreement" and other contractual relationship with the respective Defendants.

84. Defendants intentionally interfered with Plaintiffs contractual Agreement and valid business expectancies by improperly investigating,

harassing, discriminating, retaliating, and in Abdikadir's case, terminating him.

85. Such interference damaged Plaintiffs as set forth below.

## Damages

86. Defendants' actions were done willfully with reckless indifference to Plaintiffs' rights.

87. Plaintiffs have mitigated their damages in good faith.

88. Defendants' actions directly caused and proximately caused Plaintiffs the following damages:

    a. *economic damages*: including but not limited to lost past and future wages, other compensation, contract benefits, unpaid tax benefits, and reimbursement for payments Plaintiffs made pursuant to the contract; other potential compensation such as bonuses, pay raises, training, promotions, and enhanced retirement benefits; all other economic damages as may be proven due to Defendants' liability as alleged above; and incidental and consequential damages as may be proven.

    b. *non-economic damages*: including but not limited to embarrassment, humiliation, outrage, pain and suffering, mental and emotional distress.

## Relief Requested

*W H E R E F O R E*   Plaintiffs requests this honorable court grant them the following relief:

    a.    Actual and consequential damages as may be proven;

    b.    Declaratory relief recognizing that Plaintiff drivers were employees of the Defendants and that the contracts between the parties was void;

    c.    Declaratory relief finding that Defendants have illegally discriminated and retaliated against Plaintiffs;

    d.    Whatever additional injunctive and equitable relief that may be appropriate, including but not limited to invalidation of their arbitration clauses and reinstatement;

    e.    Punitive damages, for Defendants' willful conduct; and

    f.    Costs, pre- and post-judgment interest, and reasonable attorney fees.

Respectfully submitted,

NACHT & ROUMEL, P.C.

*/s/ Nicholas Roumel*

Nicholas Roumel
Attorney for plaintiff

May 11, 2021